## GAIKEMA v. BANK OF ALASKA.

### In re GORMAN & CO.

No. A–730.

Third Division.

Feb. 28, 1934.

498

500

502

504

L. V. Ray, of Seward, for plaintiff.
Warren N. Cuddy, of Anchorage, for defendant.

CLEGG, District Judge.

In the state of the pleadings as above outlined, it is questionable whether the court should discuss the matter of the validity of the mortgage of August 10, 1928, in view of the fact that, in the answer filed by the defendant, in connection with its general denial in a special additional allegation, said mortgage is specifically set up, and the same is not denied by the reply filed, and should therefore be considered as admitted. In the reply, however, to the first

affirmative defense, in which the same mortgage is again set up with greater particularity and detail as one of the mortgages under which the defendant bank foreclosed under the provisions of its said mortgage, such allegations of said affirmative defense are by the reply denied.

There is authority for the position that "there can be no denial of a statement absolutely admitted upon the record." Veasey v. Humphreys, 27 Or. 515, 41 P. 8, citing Bliss on Code Pleading, § 341; Baines v. Coos Bay Navigation Company, 41 Or. 135, 68 P. 397.

 Upon the argument it is the contention of plaintiff that the mortgage of August 10, 1928, is wholly void by reason of the fact that, at the time of its execution, the persons who purported to represent and act for the said Gorman & Co. in the execution of the same wholly lacked authority so to do. The plaintiff challenges the act of Torwick and Parry in executing the said mortgage, and contends it is not an act of the company. Such authority as Torwick and Parry had was conferred by special meeting of the board of directors of said Gorman & Co. on March 29, 1928, by resolution reading as follows:

"Resolved, that John Torwick and F. O. Parry, jointly be and are hereby authorized on behalf of the company to draw, accept, sign, make and agree to pay any or all cheques and orders for the payment of money and also authorize any Manager or other officer of the Bank of Alaska, Anchorage, Alaska, to accept all or any such cheques or orders for the payment of money on behalf of the company.

"Also that said John Torwick and F. O. Parry, jointly or either one of them, be and are hereby authorized on behalf of the Company to negotiate with, deposit with, or transfer to said Bank (but for credit of the Company's account only) all or any bills of exchange, Promissory notes, Cheques or Orders for the payment of money and other negotiable paper, and for the said purpose to endorse the same, or any of them, on behalf of the Company.

"Also that any and all such documents executed as above mentioned on behalf of the Company by said individuals hereinbefore authorized shall be valid and binding upon the Company whether or not the corporate seal of the Company has been affixed thereto."

It may be conceded that the foregoing expression of authority is very limited, and that it hardly embraces power on the part of the persons mentioned to borrow money and execute a mortgage to secure the same on behalf of the company. It does, however, give Torwick and Parry certain authority therein described over the company's finances, and to that extent clothes them with the apparent authority to do the act assailed. However, the court must, in view of the undisputed use of the money so obtained by the company for its corporate uses, take into consideration all the facts and circumstances surrounding Torwick and Parry at the time and in connection with the particular transaction.

The undisputed fact is that no higher official or officer of said company was at the scene of the company's operations on August 10, 1928, and that said operations were being conducted at a distance of at least 2,200 miles from the state of Washington and from the city of Seattle, where the home office of the company was located, and that the defendant bank acted in good faith in making said loan of $5,000 and in receiving said mortgage to secure the same, and that the moneys represented by said transaction were placed to the credit of the said company in the said bank and were wholly checked out by the said company, acting by and through the said Torwick and Parry as agents under the supposed authority so to do conferred by the board of directors as aforesaid. Such moneys were expended in their entirety for the corporate uses of the company, and in the payment of current bills for material, services, and legitimate expenses. Torwick and Parry were in full control of the property of the company in Alaska and of its operations and management.

"Persons dealing with corporate agencies have a right to rely upon the apparent authority of those in charge of the corporate business, and for acts done within the scope of that authority the corporation is bound." Pacific State Bank v. Coats (C.C.A.) 205 F. 618, 621, Ann.Cas. 1913E, 846, quoting from Parker v. Hill, 68 Wash. 134, 146, 122 P. 618, 623.

It further appears from the evidence that W. W. Stoll, secretary-treasurer, was then on his way from Anchorage, Alaska, to the city of Seattle, Wash., or had arrived in the city of Seattle at said time, and that he was apprised and informed of this transaction fully and completely within ten days of its occurrence, and that neither he, as general manager of the company, nor any other officer of said company, nor the said company, repudiated the said transaction, or any part of it, but acquiesced therein, and that thereafter the said company, in writing, ratified the acts of said Torwick and Parry in behalf of said company in executing said note and mortgage of August 10, 1928. Such ratification is contained in the mortgage of December 14, 1928, in express language as follows: "It is expressly understood and agreed that this mortgage is secondary, inferior and subsequent to a certain mortgage now held by said Bank of Alaska on said cans dated August 10th, 1928, in the principal amount of Five Thousand ($5,000) Dollars."

This specific ratification by the company of the acts of Torwick and Parry dates back to the date of the original mortgage which it sought to ratify and validates that instrument from that date thenceforward. 14A C.J. 394. The effect of such ratification is to place the parties in the same position as though the $5,000 mortgage of August 10, 1928, had been previously authorized by the corporation. 14A C.J. 392.

The real question before the court is as to the authority of the trustee to litigate with the defendant the validity of this mortgage. It is important to note that it

appears conclusively from the evidence that the authority given to the plaintiff trustee in bankruptcy by the creditors of the bankrupt, Gorman & Co., was not a general authority to contest the validity of all loans made by the bank to Gorman & Co., but was limited to contesting the validity of the mortgage of December 14, 1928. This appears from the minutes of the meeting of the general creditors of the bankrupt introduced in evidence, marked "Plaintiff's Exhibit G." This meeting occurred on February 28, 1930, and was adjourned to March 21, 1930, and the minutes of such meetings on this question show the following: "The matter of making a demand on the Bank of Alaska for $3,500.00, the amount involved in the second mortgage, together with the marshal's costs covering this particular sale, was then discussed, and the Trustee was authorized to endeavor to recover said amount, and of the moneys received from the cash sale of the machinery and equipment a reasonable sum be set aside from said amount to cover the court costs in the event the Bank of Alaska refused to pay same over and a resulting suit would terminate against the Trustee."

Following such authority vested in him by the creditors present at the meeting aforesaid, the trustee, plaintiff herein, on the 10th day of April, 1930, made a formal demand upon the defendant bank, marked "Plaintiff's Exhibit E" in the evidence:

"For restitution of the moneys involved in the so-called secondary Chattel Mortgage dated Dec. 14th, 1928, Gorman & Company, a corporation, Mortgagor, and Bank of Alaska, a corporation, Mortgagee, and other items of expense incident to said Mortgage, viz:

"1. The sum of $3,500.00, with interest at 12% per annum from Dec. 14th, 1928, to April 18, 1929, principal and interest amounting to $3,644.67.

"2. The costs and fees paid U. S. Marshal for the illegal foreclosure sale of April 18, 1929, $193.70.

"3. The attorney's fee charged for by Mortgagee in connection with said illegal foreclosure sale, $150.00.

"4. Expense of certified copies of mortgages charged by said Mortgagee in connection with said illegal sale, $8.00.

"And in addition thereto

"5. Interest on $3,996.37, being the total amount of the preceding four items, at 8% per annum, from April 19, 1929, to the final conclusion of this action;

"6. A reasonable fee for the Trustee's attorney in this matter.

"And if this Demand for restitution is not complied with by said Bank of Alaska * * *, this Trustee shall ask permission of the Referee in Bankruptcy, Anchorage Precinct, Third Division, Territory of Alaska, to bring an action in the District Court of Alaska against the Bank of Alaska, a corporation, for such restitution as mentioned above, and if permission is granted by said Referee, suit will be started forthwith."

The petition presented to the referee in bankruptcy asking for authority on the part of the trustee to commence action against the bank, as well as the order of the referee authorizing the trustee to institute such action, are by their express terms, limited to contesting the validity only of the mortgage of December 14, 1928. So that it is conclusive from the proceedings of the meeting of creditors, as shown by the minutes, and from the petition for authority from the referee to institute suit against the defendant bank, and from the order granting such authority by the referee in bankruptcy, the two latter occurring on the 6th day of August, 1930, that all of these persons and officers conceded the validity of the mortgage of August 10, 1928, for the sum of $5,000 and interest, and that they intended to assert a right in the trustee, if any, as against the bank, to recover the property represented by the $3,500 mortgage of December 14, 1928.

The complaint in the case, however, as afterwards drawn by the attorney for the trustee, goes beyond the scope of the authority conferred upon the trustee by the referee and by the creditors, and seeks to unduly enlarge and supplement such authority by his own volition with the tacit consent of the trustee in bankruptcy.

Collier on Bankruptcy, vol. 1, p. 722, § 5, reads as follows: *"Wishes of Creditors.* It is not necessarily the duty of the trustee to follow the wishes of a majority in number and amount of the creditors in prosecuting or defending suits. He is to exercise his own judgment. But when his own judgment concurs with that of a great majority of all the creditors who speak, all having the opportunity to speak, and also with that of the referee or court in charge, it would seem plain that such judgment should control. As a rule, however, save in the common and simpler steps of administration, he should consult the wishes of the creditors; in many matters the law requires him to do this."

And, further, on page 723, the text reads: "Before a trustee institutes a suit he ought to submit the reasons for the suit to the creditors and secure an order, based on their action, from the referee. Such consent seems not to be necessary when a suit is brought against him. How far the question at issue shall be gone into on such a preliminary hearing is discretionary with the referee. He should at least be sure that there is a probable cause of action."

It will be seen that it is largely optional with the trustee whether he should secure authority from the creditors or not for the institution of any action. I hold that, when the trustee sought the authority of the creditors and of the referee, as he did in this case, as above shown, he is bound to conform to their wishes under the authority he has received, and that he should not in the authorized case go beyond his granted authority and demand something additional to that contemplated by the creditors and the referee when such authority was asked and received.

This mortgage of August 10, 1928, is drawn in full harmony with the existing provisions of the laws of the territory of Alaska in all details and violates none of them, and it is undisputed that it was placed of record and recorded in the proper recording office and district where the property was situate in seasonable time, to wit, August 11, 1928, and it is the court's opinion that it established and created a valid, subsisting, and enforceable lien against the property described in such mortgage, and that such lien continued to exist from the date of its execution, and was in full force and effect on the 6th day of December, 1928, when the four-month period prior to the filing of the petition in bankruptcy commenced to run, and that the bank had a perfect legal right, on the 12th day of March, 1929, to take the said property into its possession upon default and to sell the same and apply the proceeds upon its debt, interest, and costs of sale, and that the foreclosure proceedings thereon were, in all respects, regular and legal, and that the bank, as mortgagee, had full right, power, and authority to bid in said property at said sale in conformity with the law and the provisions of said mortgage.

■ Under the provisions of the National Bankruptcy Act, under which this action is instituted (title 11 U.S.C.A. § 96, pars. (a) and (b), pp. 336 and 337), in order that plaintiff should recover, it is necessary to show as a fact, first, that Gorman & Co. was insolvent at the time of the execution of the mortgage of December 14, 1928, or on the date of enforcing the provisions of seizure and sale contained in said mortgage; second, that the creditor had reasonable cause to believe that said Gorman & Co. was then insolvent; and, third, that, in accepting and retaining the benefits of the mortgage, the creditor would receive a larger percentage of its debt than any other creditor of the same class. Bailey, Trustee, v. Baker Ice Machine Company, 239 U.S. 268, 36 S.Ct. 50, 60 L.Ed. 275; Pirie v. Chicago Title, etc., Co., 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171. See note 31 under section 96, title

11, U.S.C.A. p. 347. Gates et al. v. First Nat. Bank of Richmond, Va. (D.C.) 1 F.(2d) 820.

In this connection it is material also to consider whether the transaction diminished the estate of Gorman & Co. to the detriment of other creditors having a provable claim against the same.

It is the contention of the plaintiff that Gorman & Co. was insolvent on December 14, 1928, and thereafter. The facts disclosed by the evidence show that the company had no real property or interests of any kind unencumbered, no accounts receivable, and that the income it had derived as the result of its annual operations in Alaska during the year 1928 had been either expended or dissipated and had left a large deficit represented by scores of unpaid checks drawn by the company upon the defendant bank at Anchorage, Alaska, payment of which had been refused; that the only item of chattel property belonging to the company unencumbered by a mortgage to the limit of its value was the excess value over and above the amount required to satisfy the mortgage of August 10, 1928, of the 8,000 cases of empty tall salmon cans, and that the continuance of the business of the company for which it was organized during the coming season of 1929 depended entirely upon the ability of the company to secure a postponement of its debts with many of its larger creditors, including Koch and Everett and the natives of Tyonek, Alaska, acting through a representative of the Bureau of Indian Education; that its active manager, W. W. Stoll, who was also secretary-treasurer, found it impossible to receive financial backing in the city of Seattle, where, apparently, he had customarily found same, and that he had visited San Francisco, Cal., prior to December 14, 1928, with the view of raising additional capital to pay off one or more of its heaviest creditors, without success. It also appears from the testimony of the secretary-treasurer of the company and its manager that the president of the company was "never anything but a figurehead." The petition of

involuntary bankruptcy and adjudication of the corporation as a bankrupt appears to have been wholly uncontested. W. W. Stoll, secretary-treasurer and active manager of said corporation, had the opportunity, in giving his testimony, to inform the court in detail as to the aggregate value of its assets over its liabilities, but he merely indulged in generalities on that subject. The books of the company were not available. At the time of the taking of his testimony, the company had made a voluntary assignment for the benefit of its creditors to the Seattle Merchants' Credit Association. On January 24, 1929, the company surrendered all of the chattel property described in the mortgages now under consideration voluntarily to the defendant bank. No notice was given to other creditors of the company, or to the public generally, of the execution of the' mortgage in question, but it was withheld from the records until the 6th day of April, 1929, the date of the filing of the petition in bankruptcy, notwithstanding that the mortgagee, defendant bank, had attempted to exercise the power of seizure and sale over the mortgaged property on the 12th day of March, 1929.

"Direct and detailed evidence of the facts constituting insolvency is not essential. Owing to its nature, insolvency is not always susceptible of direct proof. It may, and in many cases must, be proved by the proof of other facts, from which the ultimate fact of insolvency may be presumed or inferred." Rosenberg v. Semple (C.C.A.) 257 F. 72, 73.

There is support also for the position that, in considering the question of solvency or insolvency, resort may be had to the verified schedules of the bankrupt in determining whether or not the bankrupt was insolvent at the time an alleged preferential conveyance was made, if such time was within a reasonable time prior to the filing of the petition in bankruptcy. See In re Mandel (D.C.) 127 F. 863, affirmed in (C.C.A.) 135 F. 1021.

514

█ The proof in this case shows that the trustee has, up to this time, realized only $6,000 out of the bankrupt's property, and that there are over $50,000 worth of provable claims against the bankrupt estate.

Under the facts and circumstances disclosed by the evidence, it is clear that said Gorman & Co. was insolvent at the time of the execution of this mortgage and continued in that condition until the bank attempted to enforce the same by seizure and sale under the power of sale provisions of the mortgage, and continued in a state of insolvency from that time on until adjudication in bankruptcy and appointment of a trustee and thereafter.

█ The court finds also that the defendant bank had reasonable cause to believe that the mortgage in question operated to effect a preference in its favor and to give to it a greater percentage of its debts against the bankrupt than to any other creditor of the same class. The bank undertook not only to give itself such preference, but to create on behalf of Anderson of the Ship Creek Market and A. A. Shonbeck a similar preference by causing a large portion of the money now claimed to be a direct loan of cash to Gorman & Co. to be set aside and distributed not only to itself but to the other creditors last mentioned. The testimony of the bank officers discloses that they made no suitable effort to avail themselves of the knowledge which the records of the Anchorage precinct and recording district would have disclosed to them as to the impounding by the company theretofore of all its available assets by mortgages to secure existing indebtedness on behalf of the company to numerous persons which instruments were not discharged on the said records. Neither did they admit any knowledge on their part of the numerous checks drawn by said company upon a supposed deposit of the company in the defendant bank at Anchorage, payment of all of which had been by certain unnamed employees of the defendant bank rejected and refused for lack of funds.

These facts and circumstances were sufficient, in the court's opinion, to put the defendant upon inquiry as to the true financial standing of Gorman & Co., either at the time the mortgage in question was executed and delivered or at the time it was sought to be foreclosed and realized upon by the defendant bank. The defendant knew the company was insolvent, or could easily have ascertained such fact by reasonable inquiry. This they failed to make. The president of the bank admits that as early as January he was advised by the secretary-treasurer of the company that the company was in hard and difficult financial circumstances. The same information could have been obtained from other sources by diligent inquiry on the part of any officer of the defendant bank.

The fact also that the company voluntarily surrendered the possession of the mortgaged property to the defendant by a formal letter under the seal of the company, dated January 24, 1929, before the due date of the note for which the mortgage in question was given, is a significant circumstance, as is also the fact that no foreclosure proceedings were taken by the defendant bank against the mortgaged property under the note and mortgage of August 10, 1928, although the debt for which the same was given was long past due on December 14, 1928, when the second mortgage was given. The record fails to show any extension by the defendant bank of said note and mortgage.

Under the facts and circumstances disclosed by the whole evidence, the court is of the opinion that the defendant bank had reasonable cause to believe that said Gorman & Co. was insolvent, and that the acceptance by it of the mortgage in question effected a preference in its behalf as against other creditors of the same class, and would prevent a ratable distribution of the assets of said Gorman & Co. in bankruptcy.

I quote from the opinion in the case of **In re** Gaylord et al., reported in (D.C.) 225 F. 234, 239: "In

Remington on Bankruptcy (2d Ed.) vol. 2, §§ 1397 to 1407, inclusive, pp. 1274 to 1288, inclusive, this subject is made quite clear. A preference is not necessarily actually fraudulent, and it is not necessary to prove that the creditor taking the security actually knew the insolvent condition of his debtor giving it, or that he actually believed the security and its enforcement would work or operate as a preference. The existence of facts which came to the creditor's knowledge, or as to which facts he had such information as put him on inquiry in taking the security, or transfer, may establish reasonable cause to believe. If the facts and circumstances proved in the case to have been within the knowledge and observation of the creditor, or as to which he was actually put on inquiry, and inquiry would have disclosed, were such as would naturally cause a business man of ordinary care and intelligence—an ordinarily careful and prudent man of intelligence and reasonable experience in business matters—to believe, then it may properly be held, and should be held, that the creditor had reasonable cause to believe the debtor was insolvent, and that the taking and enforcement of the security or transfer 'would effect a preference.' See cases supra."

A further citation of authorities will be found in 225 F. 234, on page 240 of the same opinion.

The principle of law is well known that the intention with which an act is done must be presumed from the circumstances, and, if the natural result of the act charged as a preference was to effect that result, it will be conclusively presumed that it was the intention of the debtor to effect such preference. See authorities cited under note 162, section 96, title 11, U.S.C.A. page 415.

The court is of the opinion further that the defendant bank had reasonable cause to believe that the mortgage in question would create a preference in its favor and that it did actually create such preference. The transfer sought to segregate property of the value of $3,500 at

the least estimate from the corpus of the bankrupt's estate as security to the bank for the entire loan made by it to the company, while, as a matter of fact, about 50 per cent. of the money loaned was understood between the borrower and lender prior to the loan that the same would be distributed between the bank and the two creditors heretofore mentioned, all of whose indebtednesses were antecedent and pre-existing debts and also were provable claims against the bankrupt. The mere act of the bank in directing and acquiescing in the distribution of so much of the money loaned for these purposes is sufficient to indicate that the bank had full knowledge of the preferential character of such disposition of the moneys loaned. It is true that no testimony was submitted showing what disposition was made of the balance of the moneys loaned, other than what was paid to the bank and to the other two creditors, but sufficient use of the money appears from the evidence to warrant the court, in the absence of a full and fair disclosure by the testimony of those concerned in the transaction, in assuming that the balance of the total amount loaned, or some part of it, was used for similar purpose. The illegal character of that part of the transaction which is shown by the evidence vitiates the entire transaction and places it in the category of an illegal preference effected by the transfer under consideration, which the provision of the Bankruptcy Act above referred to prohibits.

Subdivision 2 of paragraph a of section 47 of the Bankruptcy Act (title 11 U.S.C.A. § 75 (a) (2), p. 180) provides: "Such trustees, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

An elucidation of this section is found in the case of Pacific State Bank v. Coats, 205 F. 618, 622, Ann.Cas.

1913E, 846, decided by the Circuit Court of Appeals for the Ninth Circuit, in which, after quoting the foregoing section, the court states as follows: "This is an amendment to section 47, cl. 2, subd. 'a,' adopted June 25, 1910, ch. 412, § 8, 36 Stat. 840 (U.S.Comp.St.Supp.1911, p. 1500 [11 U.S.C.A. § 75(a) (2)]). It is the purpose of this amendment to vest in the trustee for the interest of all creditors the potential rights of creditors possessing or holding liens upon the property coming into his custody by legal or equitable proceedings. The trustee no longer stands in the shoes merely of the bankrupt, with the limited rights of the bankrupt to attack unrecorded liens which may be valid and unimpeachable by such bankrupt; but the amendment by operation of law vests in him a lien equivalent to such as would be acquired by legal or equitable proceedings upon the property coming into his custody by virtue of the bankruptcy proceedings. 'The class of cases, unprovided for by the original act, and intended to be reached by the amendment,' says Mr. Collier in his work on Bankruptcy (9th Ed.) p. 659, 'was that in which no creditors had acquired liens by legal or equitable proceedings and to vest in the trustee for the interest of all creditors the potential rights of creditors potential with such liens.' 'This provision of the Bankruptcy Act,' says Witner, Judge, in Re Hartdagen (D.C.) 189 F. 546, 549, 26 A.B.R. 532, 535, 'puts the trustee, in so far as the assets of the estate are concerned, in the position of a lien creditor,' distinguishing the case of York Mfg. Co. v. Cassell, 201 U.S. 344, 26 S.Ct. 481, 50 L.Ed. 782, and others of its character, which it is thought inspired the amendment. Mr. Collier is further of the view that: 'The purpose of Congress was to embrace within these words every class of creditors with liens by legal or equitable proceedings favored by the varying registration laws of each of the states.' Collier on Bankruptcy, p. 660."

"The trustee·is not limited to such objections to a transaction between the bankrupt and a creditor as the bankrupt might have had, but he may make any objection that

a creditor holding a lien might make. An agreement, therefore, which prior to this amendment would have been valid between the parties, may not be valid as against the trustee." Meier & Frank Co. v. Sabin (C.C.A.) 214 F. 231, 233; Scandinavian-American Bank v. Sabin (C.C.A.) 227 F. 579, 581.

The provisions of the Bankruptcy Act under which this case is instituted, namely, section 96, title 11, U.S.C.A. (a) and (b), pp. 336, 337, with reference to preferences, fixes the time as "within four months before the filing of the petition, or after the filing of the petition and before the adjudication."

By the law and the authorities "upon adjudication of bankruptcy, title to all the property of the bankrupt, wherever situated, vests in the trustee as of the date of filing the petition in bankruptcy." American Surety Co. of New York v. Owens, 62 App.D.C. 210, 66 F.(2d) 190, 191; Isaacs v. Hobbs Tie & Timber Co., 282 U.S. 734, 737, 51 S.Ct. 270, 75 L.Ed. 645.

Applying this rule of the law and giving effect to the two previous sections of the provisions of the Bankruptcy Act above referred to, it seems apparent that the title of the trustee to all property of the bankrupt attaches on the date of the filing of the petition in bankruptcy.

In my opinion, therefore, the right of the trustee to this particular property of the bankrupt would be either a vested title or a valid lien upon the property in question. If he has not absolute title, he has a valid lien. Such lien would arise and commence on the 6th day of December, 1928, and would exist thenceforth eight days prior to and on the 14th day of December, 1928, when the mortgage in question was executed and delivered, and thereafter. Assuredly such lien was effective on March 12, 1929. The mortgagor bankrupt was powerless to confer on the defendant bank any security by means of the attempted transfer or to seize and sell the property; the sections of the law above quoted having deprived the mort-

gagee of the right so to dispose of the property sought to be mortgaged. The trustee in bankruptcy had a prior and paramount right under the lien created by the law in his favor.

In the case of In re Mandel (D.C.) 127 F. 863, at·page 865, supra, Mr. Justice Holt confirms the report of the referee, which said report reads as follows: "Third. Under the ruling in the case of Mathews v. Hardt, 9 A.B.R. 373, 79 App.Div. 570, 80 N.Y.S. 462, which was decided by the Appellate Division of the Supreme Court, this department, in January, 1903, it was held, construing section 60 of the bankruptcy act [11 U.S.C.A. § 96], that an agreement by which a firm was to make an advance to a corporation, and should have a lien for the same upon the property of the corporation, is to be treated as of the date when possession was taken, and not when the agreement for the lien was given. The question to be determined in such cases is therefore: 'Did the delivery of the possession to the defendants and their taking possession within four months of the bankruptcy constitute a preference within the meaning of the bankruptcy act?' As is well stated in the opinion in this case, 'the trend of the decisions in the United States Supreme Court under the recent bankruptcy act upon the subject of the date of transfers is in support of the view that, with respect to an instrument of transfer, it is the time when such instrument is recorded or when possession is taken or notice is otherwise brought home to the creditors of the bankrupt that is controlling.' In Crooks v. Bank, 3 A.B.R. [238], 242 [46 App.Div. 335], 61 N.Y.S. 604, decided by the Appellate Division, the court says: 'It is the result or effect of the act done which is declared against, not the manner or method by which it is done. No matter how circuitous the method may be, if the effect of a transfer of property, made within four months before the filing of a petition in bankruptcy, is to enable any of the bankrupt's creditors to obtain a greater percentage of his debt than others in the same class, then such transfer is voidable, if the person receiving it or to be

benefited thereby had reasonable cause to believe that it was intended thereby to give a preference.' "

If, for any reason, these views are untenable, attention is directed to the provisions of the laws of the territory of Alaska. Section 740, Compiled Laws of Alaska, chapter 31, page 350, provides as follows:

"Sec. 740. 'A mortgage of personal property is void as against creditors of the mortgagor and subsequent purchasers and incumbrancers of the property in good faith for value, unless—

"(1) The possession of such property be delivered to and retained by the mortgagee; or

"(2) The mortgage provide that the property may remain in the possession of the mortgagor and be accompanied by an affidavit of all the parties thereto, or, in case any party is absent from the precinct where such mortgage is executed, at the time of the execution thereof, an affidavit of those present and of the agent or attorney in fact of such absent party that the same is made in good faith to secure the amount named therein, and without any design to hinder, delay, or defraud creditors, and be acknowledged and filed as hereinafter provided."

While there were many creditors of the bankrupt Gorman & Co. at the date of the execution of the mortgage in question, the trustee in bankruptcy, plaintiff herein, was the only creditor holding a valid lien against the property of the bankrupt. This lien was his by operation of law. It will be remembered that this mortgage was not recorded until the date of the filing of the petition in bankruptcy.

Section 743 of the Compiled Laws of Alaska, chapter 31, page 351, provides: "Sec. 743. Every mortgage of personal property, together with the affidavits of the parties thereto or a copy thereof, certified to be correct by the person before whom the acknowledgment has been made, must be filed in the office of the recorder of the precinct where the mortgagor resides, and of the pre-

cinct where the property is at the time of the execution of the mortgage, or, in case he is not a resident of the district, then in the office of the recorder of the precinct where the property is at the time of the execution of the mortgage; and the recorder must, on receipt of such mortgage or copy, indorse thereon the time of receiving the same, and file and keep the same in his office for the inspection of all persons, and shall enter in a book, properly ruled and kept for that purpose, the names of all the parties—the names of the mortgagors to be alphabetically arranged—the consideration thereof, the date of its maturity, and the time of filing the same."

The failure of the defendant bank to record this mortgage rendered it void as against the plaintiff trustee in bankruptcy, and the effort of the defendant bank, on the 12th day of March, 1929, to reduce the property mortgaged to its actual possession, was futile and ineffectual to confer any rights under said mortgage upon the defendant bank to the property described in the mortgage. Lieman v. Northern Commercial Co., et al., 6 Alaska, 536, and the authorities there cited; In re Minkove, 6 Alaska, 68.

 The court finds that the value of the property described in the mortgage in question was of the sum of $8,500. Testimony was introduced showing that the landed cost price of each case of cans was $1.50, and that a shrinkage in value occurred to the extent of 12 to 25 per cent. from storing such cases of cans over the winter in Alaska, but no witness testified how long the cases of cans in question had been stored in Alaska, that is to say, how many winters, and no person who testified claimed to have had personal knowledge of the condition of each case or the contents of each case. The court accepts the testimony of the witnesses who testified that the total value of the 8,000 cases of empty cans was $8,500 as the true criterion of value.

On the question of attorney's fees claimed to have been paid on the foreclosure of the mortgage in question by virtue of the provisions contained in the note and mortgage amounting to the sum of $150, the court has examined both notes and both mortgages and finds no provision allowing any attorney's fees for the foreclosure of either mortgage without suit or action.

On the question of attorney's fees for either of the parties in the case, an allowance to both of reasonable attorney's fees would merely result in allowing one to be set off against the other and would be an idle performance. The court does, however, allow to the attorney for plaintiff the statutory attorney's fee of $40.

A judgment and decree should pass in favor of the plaintiff declaring void the mortgage of December 14, 1928, and that no right or title passed to the defendant bank by virtue of the attempted sale of the mortgaged property under the foreclosure proceedings heretofore mentioned, and that the plaintiff is entitled to recovery from defendant of the value of the property in excess of the value derived from the sale thereof which is sufficient to pay and satisfy the principal amount of the mortgage of August 10, 1928, with unpaid interest at 12 per cent. per annum, and all necessary costs of said sale under said mortgage. Such value thus ascertained will bear interest at the rate of 8 per cent. per annum from October 28, 1929, to the date of rendition of judgment herein. The sum of $8,500 is hereby declared and established as the fair and reasonable aggregate value of the 8,000 cases of empty tall salmon cans sold by the defendant in the foreclosure proceedings hereinbefore referred to.

Findings of fact and conclusions of law in accordance herewith may be submitted. The findings of fact and conclusions of law should contain necessary provisions holding valid the mortgage dated August 10, 1928, and the fore-

closure proceedings thereunder, and decreeing the right of defendant to retain the proceeds of such mortgage as indicated hereinabove.