**SEA LION CORPORATION, Appellant,**

v.

**AIR LOGISTICS OF ALASKA, INC., et al., Appellees.**

No. S–2967.

Supreme Court of Alaska.

Feb. 9, 1990.

David E. Kohfield, Ronald E. Cummings and William K. Walker, Anchorage, for appellant.

Kevin G. Clarkson and Clark R. Nichols, Perkins Coie, Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

COMPTON, Justice.

This appeal is from a grant of summary judgment in favor of Air Logistics of Alaska, Inc. (Air Log). The principal question presented is whether Sea Lion Corporation (Sea Lion) should be held liable on a contract executed between Air Log and an entity referred to in the contract as "Bush Transport Systems" (BTS). We conclude that Sea Lion ratified the contract and therefore affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts, resolving disputes in the evidence in favor of Sea Lion, are as follows.

Myron Naneng (Naneng) was at all relevant times the president and chairman of the board of directors of Sea Lion. Between 1982 and October 1984, Larry D. Gillespie (Gillespie) was employed by Sea Lion as a consultant in connection with Sea Lion's operation of an air taxi service. Gillespie also owned and operated his own air cargo service, Air Valley. Sea Lion had financed Gillespie's formation of Air Valley by means of a loan.

In the summer of 1984, Gillespie and Sea Lion began discussions with a view toward merging their operations in the air transport business. Contemplated was the eventual formation of a limited partnership with Gillespie as the general partner and Sea Lion, *inter alia*, as a limited partner. The limited partnership was to take the name of BTS, then being used by Gillespie as a d/b/a of his own flight service. Around the same time, Air Log, which owned cargo aircraft, decided to shut down a portion of its Alaska operations and send surplus aircraft to the "lower 48."

Gillespie, hoping to use Air Log's planes in connection with BTS operations, approached Air Log and asked what it would take for Air Log not to shut down its Alaska operations. Air Log replied that BTS would need to pay all expenses which would result from maintaining the operation. Gillespie then represented to Air Log that "Sea Lion had the financial depth to make this agreement work."

A second meeting was held between representatives of Air Log, Gillespie, and two officers of Sea Lion, Naneng and James Joseph (Joseph). Joseph was at all relevant times the secretary/treasurer of Sea Lion, its general manager and a member of its board. Air Log made clear to both Naneng and Joseph that there would be no deal between itself and BTS unless "Sea Lion signed the contract and agreed to back up" the obligations of BTS.

On October 1, 1984, Gillespie and Naneng met with Air Log in order to execute a flight service agreement (FSA) whereby BTS would obtain aircraft and services from Air Log. The 1984 FSA consisted of a five page Agreement for Flight Service (Agreement) containing the bulk of the substantive elements of the contract, and two "Side Letters." All three items were presented to Gillespie and Naneng as a single document. The FSA expired by its terms on December 31, 1984. The Agreement was signed under the name of BTS "by" Gillespie and Naneng, without reference to Sea Lion. The accompanying Side Letters contained supplementary and clean up terms to the Agreement.

The signature block of the first Side Letter is identical to that of the Agreement. The second Side Letter notes that its purpose "is to explain, clarify, define or expand the intent" of the FSA. It contains arbitration, choice of law, and force majeur clauses. Furthermore, it contains an "identification" clause, which states ". . . given the prudent requirement to maintain non-disclosure of the identities of the principals, let it now be revealed that the participants of Bush Transport System are: Sea Lion Corporation, P.O. Box 44, Hooper Bay, AK 99604," *inter alia*. The second Side Letter was signed BTS "by" Gillespie and "by" "Myron Naneng, Sea Lion Corporation." There is no evidence to suggest that Naneng signed in any capacity other than as a purported Sea Lion representative, and both Joseph, testifying as the designated representative of Sea Lion and Naneng admit that he acted in this capacity. Naneng signed the 1984 FSA on the heels of a repeated insistence by Air Log that Sea Lion sign the FSA or there would be no deal and the planes would be removed from Alaska.

Following the execution of the 1984 FSA, both Joseph and Ronald Cummings, counsel for Sea Lion, learned what Naneng had done. Cummings told Joseph that Naneng had signed a document that "put us in a bad position later on." When Joseph saw the 1984 FSA for himself, he told Naneng "Oh, ____, please don't sign it," but by then Naneng already had. (Expletive deleted). The reason for Joseph's concern was his realization that the 1984 FSA obligated Sea Lion "to deliver services that . . . we're not supposed to deliver." Cummings then

drafted a "Memorandum of Understanding." In the memo, Naneng, on behalf of Sea Lion, and Gillespie agreed *inter se* that Naneng's signature was not intended to obligate Sea Lion on the 1984 FSA, but was merely for "security purposes only." Air Log never saw this memo nor learned of its terms or its existence.

On October 28 Sea Lion's board met. The result of the meeting was inconclusive. The major question was "whether Sea Lion would participate in the BTS venture with Air Valley." A $75,000 "advance" was made to Gillespie. The advance was "considered a loan with interest unless the board of Sea Lion decides to enter into a partnership." The loan was evidenced by a promissory note. Gillespie, who was present at the meeting, told the board "an additional $75,000 would be required for November, thus requiring an up front $150,000 to buy into the partnership."

On November 9 the Sea Lion board met again. The full board "voted in favor of becoming a member of BTS as a limited partner." The board authorized another $81,000 advance to Gillespie, also evidenced by a promissory note. Sea Lion's audited 1984 financial statement stated that in January 1985 Sea Lion Corporation "entered into a limited partnership" with Gillespie. A March 1985 entry in BTS' books ascribes $156,000 of "partner's equity" to Sea Lion as of date. Joseph testified, however, that the Sea Lion board never authorized participation as a general partner in BTS.

On December 31, 1984, the 1984 FSA expired. Gerald Skipton (Skipton), a CPA employed by Sea Lion, met with Gillespie and representatives of Air Log to discuss the execution of a new FSA for 1985. Gillespie told Air Log at this meeting that Sea Lion "wasn't going to be a general partner; they were going to be a limited partner." Air Log repeated its position that there would be no dealings with BTS unless Sea Lion signed a FSA and was financially liable. Skipton laughed and told Air Log to try and "talk them (Sea Lion) into it and get the board to vote that way."

In April Gillespie and Naneng met with Air Log to execute the 1985 FSA. The 1985 FSA is virtually identical to the 1984 FSA. It consists of a nine-page Agreement for Flight Service, and two 2-page "Side Letters." All documents were again presented in a single package and executed *seriatim*. The second Side Letter of the 1985 FSA is indistinguishable from the second Side Letter of the 1984 FSA. It notes that its purpose "is to explain, clarify, define or expand the intent" of the main body. It contains arbitration, choice of law, and force majeur clauses. Furthermore, it contains an "identification" clause, which states "... given the prudent requirement to maintain non-disclosure of the identities of the principals, let it now be revealed that the participants of Bush Transport System are: Sea Lion Corporation, P.O. Box 44, Hooper Bay, AK 99604," *inter alios.*

When confronted with the second Side Letter, Gillespie objected on the grounds that there was no valid reason for Naneng to sign the FSA, because Sea Lion was not going to be a general partner in BTS. Air Log was unmoved and repeated its position that if Sea Lion did not sign the FSA, there would be no deal. Naneng then signed the FSA. He did so to keep the planes in the state and avoid having Air Log withdraw from the deal, "the same [reason] we (Sea Lion) signed ... the first one."

As with the 1984 FSA, the Agreement and the first Side Letter were signed BTS "by" Gillespie and "by" Naneng, without reference to Sea Lion. The second Side Letter was signed BTS "by" Gillespie and "by" "Myron Naneng, Sea Lion Corporation."

As with the 1984 FSA, Naneng showed Joseph the 1985 FSA, bearing Naneng's signature, shortly after its execution. Joseph again realized that Naneng's signature exposed Sea Lion to the risk of liability and told Naneng "Myron, come on, you shouldn't have signed this." Testifying as the designated representative of Sea Lion, Joseph also admitted that the corporation knew of Naneng's act and its repercus-

sions. This admission was repeated at oral argument.[1]

On May 26, 1985, a formal limited partnership agreement was finally executed between Gillespie and Sea Lion. Sea Lion concedes that it and Gillespie were not limited partners until this agreement was executed, contending they were merely creditor and debtor. This limited partnership agreement was never shown nor its terms made known to Air Log until litigation. No statutory certificate of limited partnership was filed until July 26, 1985.

BTS eventually fell substantially behind on payments due for services rendered under the 1985 FSA. Along with Sea Lion individually, BTS and Gillespie were sued for moneys owing and other claims by Air Log.

1. At oral argument, counsel for Sea Lion made the following concession:

> JUSTICE COMPTON: Okay, and after he (Naneng) signed it, this second letter, in a corporate capacity, authorized or not, the board became apprised of what had happened, is that right?
> KOHFIELD: Uh, I'm not ...
> JUSTICE COMPTON: The board learned that he had signed this ... this agreement ... whatever the agreement was.... The board of Sea Lion Corporation learned that Naneng had signed this, isn't that correct:
> KOHFIELD: Yes, I believe that's correct.
> JUSTICE COMPTON: And, then, what did the board do in response to that, to, uh, alert Air Logistics that it was not going to, um, assume any liability for what Mr. Naneng did?
> KOHFIELD: Well, I guess in one sense I question just how much the board of Sea Lion Corporation has to do to alert Air Log that they have no intention of being liable on the contract....

2. The superior court also rejected Sea Lion's defense that Air Log should be estopped from treating Sea Lion as anything more than a limited partner, on the grounds that Alaska law does not accept the doctrine of "limited partnership by estoppel." Sea Lion first contends that despite the fact that it had not filed a certificate of limited partnership pursuant to AS 32.10.020, Air Log should either be estopped or quasi-estopped from holding Sea Lion liable as anything more than a limited partner.

This court recently reiterated the requirements for both "traditional" and "quasi" estoppel. *Dressel v. Weeks,* 779 P.2d 324 (Alaska 1989). Traditional estoppel requires the assertion of a position by conduct or word, reasonable reliance thereon by a party, and resulting

The superior court granted summary judgment in favor of Air Log on the issue of liability. Sea Lion was found liable as a matter of law on five grounds: 1) being a direct signatory to the contract, 2) defective execution of the limited partnership agreement between Sea Lion and Gillespie, 3) excessive participation in the affairs of the partnership, 4) partnership by estoppel and 5) joint venturer by estoppel.[2] We find it necessary only to address the direct signatory theory.

## II. DISCUSSION

### THE SUPERIOR COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO AIR LOG ON THE GROUND THAT SEA LION WAS A DIRECT SIGNATORY TO THE 1985 FSA.

prejudice. *Id.* at 329. Quasi-estoppel precludes a party from taking a position inconsistent with one taken previously when circumstances render the assertion of the second position unconscionable. *Id.*

There is no evidence in the record that Air Log ever accepted Sea Lion's self-characterization as a limited partner or creditor before the 1985 FSA was executed. Rather, the record is clear that Air Log insisted that Sea Lion back up the 1985 FSA regardless of how it characterized itself. Air Log cannot thus be said to have taken the position that Sea Lion was a limited partner; rather, this is an attempt by Sea Lion to ascribe its litigation position to Air Log. We also note that estoppel is an equitable remedy. Equity requires that those who seek it shall have acted fairly and without fraud or deceit as to the controversy in issue. *Knaebel v. Heiner,* 663 P.2d 551, 554 (Alaska 1983). There exists substantial doubt, given Sea Lion's secret disvowals of Naneng's signature, whether it is entitled to equity.

Alternatively, Sea Lion urges us to adopt the rule that where a partnership has been formed, yet no certificate of limited partnership has been filed, creditors dealing with the partnership as a limited partnership other than in good faith are estopped from relying on the lack of filing. *E.g., Garrett v. Koepke,* 569 S.W.2d 568 (Tex.Civ.App.1978). Although this is the rule under the Revised Uniform Limited Partnership Act, a few courts have adopted the rule judicially in jurisdictions, such as Alaska, still utilizing the old Act. *See* Revised Unif. Ltd. Partnership Act § 304(b), 6 U.L.A. 311 (Supp.1989). We do not reach this issue. Sea Lion concedes it was not a partner of any kind at the time Naneng executed the 1985 FSA and we do not resolve this case on a partnership theory.

A. Sea Lion cannot raise its arguments that (1) the 1985 FSA and its "Side Letters" ought not to be construed as one contract, and (2) there was no "mutual assent" between Sea Lion and Air Log on appeal.

Sea Lion contends that there are material questions of fact regarding 1) which documents ought to be considered part of the 1985 FSA to determine whether Sea Lion signed it or not, 2) the presence of mutual assent between Sea Lion and Air Log, and 3) Naneng's actual or apparent authority to bind Sea Lion to the 1985 FSA. Air Log contends that these issues were not raised in the superior court and ought not to receive appellate review. In the alternative, Air Log contends that there are no material questions of fact as to these issues. Sea Lion, in turn, argues that the issues either were explicitly raised, or ought to be entertained anyway, relying on *State v. Northwestern Construction, Inc.*, 741 P.2d 235 (Alaska 1987).

■ Arguments are considered on appeal if raised explicitly in the superior court, or if the issue is "1) not dependent on any new or controverted facts; 2) closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings," or if failure to address the issue would propagate "plain error." *Northwestern Construction, Inc.*, 741 P.2d at 239.

■ Our review of the record reveals that Sea Lion raised only the agency argument before the superior court. Sea Lion suggests that the integration and assent arguments "could be gleaned" from no more than the text of the 1985 FSA itself and its answer, generally denying liability on the 1985 FSA. This court will not glean new theories on appeal from nothing more than a general denial. *Cf. Smith v. Sellar*, 371 P.2d 809, 810 (Alaska 1962). Any theory at all could be gleaned from a general denial.

■ This court has entertained otherwise improper arguments if to refuse would constitute plain error. *Northwestern Construction*, 741 P.2d at 239. Plain error exists if it appears that an obvious mistake "has been made which creates a high likelihood that injustice has resulted." *Miller v. Sears*, 636 P.2d 1183, 1189 (Alaska 1981).

Our refusal to consider these issues does not propagate plain error. No obvious mistake has been made. There is a paucity of either evidence or argument directed toward either issue appearing in the record.

■ Furthermore, assuming *arguendo* that Sea Lion has raised either issue, its positions have little merit. Where two or more contractual documents are executed substantially simultaneously and are clearly interrelated, they must be construed as the whole contract, as a rule of construction. *E.g., Kroblin Refrigerated XPress, Inc. v. Pitterich*, 805 F.2d 96, 107–08 (3rd Cir.1986) (applying Pennsylvania law); *Deer Creek, Inc. v. Clarendon Hot Springs Ranch, Inc.*, 107 Idaho 286, 688 P.2d 1191, 1200 (Ct.App.1984); *Atlas Corp. v. Clovis Nat'l. Bank*, 737 P.2d 225, 229 (Utah 1987).

■ It is undisputed that the 1985 Agreement was executed simultaneously with the second Side Letter. Naneng signed the second Side Letter, purportedly in his corporate capacity. The second Side Letter makes express reference to the rest of the contract, noting that its "purpose" is to "explain, clarify, define, or expand the intent of certain terms and conditions of Agreement for Flight Services." The documents are thus expressly interrelated. The Side Letter also contains substantive contract terms, including choice of law, force majeur, and arbitration clauses. These clauses are not merely declaratory but create substantive rights and duties. If, as Sea Lion argues, the second Side Letter was merely declaratory, these clauses would be unnecessary. Naneng signed this document on Sea Lion's behalf. Furthermore, Joseph, testifying on behalf of Sea Lion in his deposition, understood that Naneng's acts in connection with the 1985 and the analogous 1984 FSAs amounted to the execution of a contract.

The foregoing suffices as a matter of law to find Naneng at least purported to execute the whole on Sea Lion's behalf, setting aside the issue of scope of authority. It is axiomatic that a party need not sign every page of a contract to be bound to the whole of the contract. *E.g., Westinghouse Elec. Corp. v. Nielsons, Inc.*, 647 F.Supp. 896, 902 (D.Colo.1986); 37 C.J.S. *Frauds, Statute of* § 205 (1955). The superior court's resolution of the issue cannot be seen as plain error.

Nor did the court commit plain error regarding mutual assent. Mutual assent is an elementary requirement for a binding contract. *State v. Fairbanks North Star Borough School Dist.*, 621 P.2d 1329, 1331 n. 3 (Alaska 1981). It is elementary that mutual assent can be found in the objective meaning of words used. *Howarth v. First Nat'l. Bank of Anchorage*, 596 P.2d 1164, 1167 (Alaska 1979). "A party cannot rely on its subjective intent to defeat the existence of a contract if its words and actions objectively and reasonably led another to believe a contract had been entered." *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1281 (Alaska 1985).

No one contends, unlike in *Zeman*, that the 1985 FSA, signed by Naneng, was a mere negotiation. A final contract involving someone plainly existed. Naneng signed it, purportedly on behalf of Sea Lion. Furthermore, it is undisputed that Naneng, as Sea Lion's president and chairman, was an agent of Sea Lion. Sea Lion's "mutual assent" argument thus stands revealed as merely another expression of its agency argument: that it should not be held liable on the contract because Naneng exceeded his authority. The irrelevance of the scope of Naneng's authority is addressed *infra.*

Sea Lion incidentally argues that the language in the 1985 FSA identifying Sea Lion as a "participant" in BTS is ambiguous. This is irrelevant. Sea Lion does not contend that the part of the 1985 FSA obligating the signatories to pay for services rendered is ambiguous, and Naneng signed on Sea Lion's behalf.

B. Sea Lion is liable as a direct signatory to the 1985 FSA upon a theory of "ratification by silence."

Air Log contends in its brief that Sea Lion by its silence ratified Naneng's signature on the 1985 FSA. Sea Lion responds, in essence, that there are material questions of fact for the jury on the issue of ratification. Even though this was not a theory expressly relied upon by the trial court, both parties have briefed the issue. An appellee may defend a judgment on any basis established by the record, whether or not it was relied on by the trial court or even raised before the trial court so long as no new factual determinations are required. *Demoski v. New*, 737 P.2d 780, 786 (Alaska 1987); *Ransom v. Haner*, 362 P.2d 282, 285 (Alaska 1961).

When reviewing a grant of summary judgment, this court must determine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment on the law applicable to the established facts. *Zeman v. Lufthansa German Airlines*, 699 P.2d at 1281. All reasonable inferences of fact from proffered materials must be drawn against the moving party (Air Log) and in favor of the non-moving party (Sea Lion). *Id.* "[I]f the movant establishes *prima facie* that it is entitled to judgment as a matter of law, the party opposing summary judgment must demonstrate that there exists a genuine issue of material fact to be litigated." *Wassink v. Hawkins*, 763 P.2d 971, 973 (Alaska 1988). To grant summary judgment on a direct signatory theory, the superior court must have found 1) either actual or apparent authority as a matter of law, *or* 2) that despite no actual or apparent authority, Sea Lion should nonetheless be bound as a matter of law.

Alaska has in three cases recognized the doctrine of "ratification by silence." *Alaska Continental Bank v. Anchorage Commercial Land Associates*, 781 P.2d 562, 565 (Alaska 1989); *Bruton v. Automatic Welding & Supply Corp.*, 513 P.2d 1122, 1126–28 (Alaska 1973); *Gaikema v. Bank of Alaska*, 8 Alaska 495, 507 (1934). Ratification is an agency doctrine, created by common law courts to deal with a situation where, after a transaction is

entered into by a second party purporting to act for a principal, the principal manifests an intent to be bound by the acts of the second party. *Bruton,* 513 P.2d at 1127. The focus is on what occurred subsequent to the agent's act; the scope of the agent's authority becomes irrelevant. *Id.* Thus, evidence going to Naneng's authority or lack thereof creates no issue of material fact as to ratification; we assume he lacked authority.[3]

■ In *Bruton,* this court outlined two requirements for an otherwise unauthorized act to be ratified by the principal's silence. The first is that the act sought to be ratified, as with any theory of ratification, must be done by someone who held himself out to the third party as an agent for the principal. *Id.; see also Pul-*

*len v. Dale,* 109 F.2d 538, 539 (9th Cir.1940) (applying Alaska law). Naneng's execution of the 1985 FSA clearly satisfies this first requirement.

■ Second, the principal must then have failed to act in response under circumstances which "according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent...." *Bruton,* 513 P.2d at 1127, *quoting* Restatement (Second) of Agency § 94, comment a (1957). The *prior* knowledge, or lack thereof, of the principal regarding the likelihood of reliance by the third party on the agent's authority is irrelevant. *See* Restatement (Second) of Agency § 94, comment a (1957). Although ordinarily ratification is a question of fact, silence of the principal effects ratification

---

3. Sea Lion's arguments that it should not be held liable summarily on the issues of actual or apparent authority are persuasive, though in the end irrelevant.

Naneng acted as an agent of Sea Lion at the 1985 FSA signing. A disclosed principal is subject to liability upon contracts made by an agent acting within his authority. Restatement (Second) of Agency § 144 (1958). Authority sufficient to bind a principal can be either actual or apparent. *Bruton,* 513 P.2d at 1125.

Air Log contends as an initial matter that Sea Lion did not raise the question of the scope of Naneng's authority until after summary judgment had been entered. Air Log's contention is without merit. As discussed *infra,* Sea Lion presented considerable evidence explicitly calling the scope of Naneng's authority into doubt and which was relevant to no other issue, despite not arguing it explicitly until its motion for reconsideration. *See Thorstenson v. ARCO Alaska, Inc.,* 780 P.2d 371, 375 (Alaska 1989).

Actual authority is created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the *agent* to believe that principal desires him so to act on the principal's account." *Bruton,* 513 P.2d at 1125 (*quoting* Restatement (Second) of Agency § 26 (1958)).

Summary judgment was improper on an actual authority theory. The reasonableness of Naneng's belief as to what he was authorized to do is at issue here. *See Perkins v. Willacy,* 431 P.2d 141, 143 (Alaska 1967). The record, drawing all reasonable inferences in favor of Sea Lion, shows that Naneng knew, based on the 1984 Memorandum of Understanding, that he lacked board approval to obligate Sea Lion on contracts in connection with BTS. These allegations raise material questions of fact with regard to the reasonableness of Naneng's beliefs regarding the extent of his authority.

Apparent authority, by contrast, focuses on the reasonable beliefs of the third party (Air Log).

> Apparent authority to do an act is created as to third persons by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

*City of Delta Junction v. Mack Trucks, Inc.,* 670 P.2d 1128, 1130 (Alaska 1983) (*quoting* Restatement (Second) of Agency § 27 at 103 (1958)). *See also Jackson v. Power,* 743 P.2d 1376, 1381 (Alaska 1987).

Skipton, Sea Lion's accountant, testified he told Air Log that Sea Lion was unwilling to be bound as a general partner and wanted only limited partner liability. He testified that he informed Air Log that the Sea Lion board would have to approve further action. Furthermore, Gillespie testified that at the actual signing of the 1985 FSA, he also informed Air Log that "Sea Lion Corporation was not a general partner in [BTS] and, therefore, had no responsibility to sign the agreement." A reasonable trier of fact could come to the conclusion that any belief by Air Log that Naneng had authority to sign the 1985 FSA was unreasonable.

Sea Lion appears to contend, against the vast weight of authority in Alaska, *see, e.g., Bruton; Perkins; City of Delta Junction,* that the Restatement view of apparent authority is not the law in Alaska. They cite dictum from one case, *State v. Neal & Sons, Inc.,* 489 P.2d 1016, 1019 (Alaska 1971), to the effect that as a matter of law a third party must either investigate the extent of an agent's authority or deal only at its peril. All subsequent (and prior) Alaska law is to the contrary, utilizing the Restatement view. To the extent the dictum in *Neal & Sons, Inc.* suggests otherwise, it is expressly disapproved.

as a matter of law if the "case is so clear that reasonable men could come to but one conclusion." *Id.; Guaschino v. Eucalyptus, Inc.,* 3 Haw.App. 632, 658 P.2d 888, 894 (1983). In essence, this standard is the same as the one used for reviewing summary judgments.

Moreover, the Restatement notes:

A principal's silence is usually more significant if an agent has exceeded his powers in the particular transaction, especially if the agent acted from an excess of zeal. If such an agent reports the matter to the principal at a time or in a manner calculated to call for dissent if the principal were unwilling to affirm, the latter's failure to dissent, if unexplained, furnishes sufficient evidence of affirmance.

Restatement (Second) of Agency § 94, comment b (1957).

■ Cases adopting and interpreting this section of the Restatement have often held that this second requirement is met as to a third party where the principal has actual knowledge of the material facts surrounding a transaction entered into by an agent with some authority to act for the principal and takes no action to repudiate it. *Rouse Woodstock, Inc. v. Surety Fed. Sav. & Loan Ass'n,* 630 F.Supp. 1004, 1011 (N.D.Ill.1986); *Evanston Bank v. Conti-Commodity Services, Inc.,* 623 F.Supp. 1014, 1034 (N.D.Ill.1985); *University Mktg. & Consulting v. Hartford Life & Accident Ins. Co.,* 413 F.Supp. 1250, 1260 (E.D.Pa. 1976). *See also* Seavey, *Ratification by Silence,* 103 U.Pa.L.Rev. 30, 33 (1954); Story, *Agency* 300 (9th ed. 1882). Thus it appears that the Sea Lion board would have to have known of Naneng's execution of the 1985 FSA, and therefore done nothing to repudiate that act, in order for Naneng to have bound the corporation. The knowledge necessary to ratify an unauthorized act must be that of an entity with power to authorize it in the first instance. *E.g., Ulloa v. Guam Economic Dev. Auth.,* 580 F.2d 952, 956 (9th Cir.1978); *See–Tee Mining Corp. v. National Sales, Inc.,* 76 N.M. 677, 417 P.2d 810, 811 (1966); 2 Fletcher Cyc. Corp. ¶ 762 (1982). However, when it is the board of directors which must authorize the transaction, the board may ratify by acquiescence and without any formal action. It need not act at a meeting regularly called. *Ulloa,* 580 F.2d at 956 (*quoting* Fletcher at ¶ 762). *See also Bank of Santa Fe v. Honey Boy Haven, Inc.,* 106 N.M. 584, 746 P.2d 1116, 1119 (1987). The rationale is plain: liability is not predicated upon some act of the board, but upon its failure to act. The lack of evidence that Sea Lion's board did not hear of or discuss Naneng's signature at a formal board meeting is thus not fatal.

■ The relevant facts, taken in the light most favorable to Sea Lion, show that Naneng was its president and chairman of its Board, with some authority to act on its behalf. Naneng admits that he signed the 1985 FSA on behalf of Sea Lion. Naneng and Joseph, another board member, were both aware that the reason Air Log insisted that Naneng sign the 1985 FSA was to make Sea Lion liable on it, and that Air Log would not have entered the 1985 FSA if he did not. Naneng admits that he signed the contract so that Air Log would not withdraw from negotiations.

When confronted with the fact that Naneng signed the 1985 FSA, Joseph read the document and exclaimed, "Myron, come on, you shouldn't have signed this." Joseph knew that the document exposed Sea Lion to a risk of liability, having earlier testified that Sea Lion knew in connection with the analogous 1984 FSA that "we had to get out of this contract because we're [Sea Lion] not supposed to be in this kind of contract at all." More importantly, Joseph, testifying as Sea Lion's designated representative, admitted that Sea Lion knew it. This admission was repeated at oral argument. Joseph also testified that he had "told Myron not to sign, but apparently Gillespie needed the aircraft, so it was" and that "we were forced into this." "We" obviously refers to Sea Lion. Joseph characterized Air Log's insistence that Naneng sign in his corporate capacity as "blackmail."

Despite being "blackmailed," and despite its assertion that it was at that time still negotiating with Gillespie for limited liability, Sea Lion said nothing tending to disavow the effect of Naneng's signature to Air Log. The "Memorandum of Under-

standing" between Sea Lion and Naneng prepared following execution of the 1984 FSA, was not shown or made known to Air Log, at this time despite Sea Lion having been advised by counsel as to the effect of Naneng's signature on the analogous 1984 FSA.

This fact pattern is indistinguishable from the Restatement (Second) of Agency § 94, comment b, quoted *supra*. An admitted agent exceeded his authority in a moment of zeal to avoid the loss of an investment opportunity for his principal. He reported the matter to his principal, who on a previous analogous occasion drafted a secret memo qualifying the effect of his signature. On both occasions the secretary/treasurer of the principal chastised the agent, realizing the risk created. The principal then said nothing to the third party (Air Log) to disavow the agent's signature until it was sued about a year later. This is "sufficient evidence of affirmance" absent an adequate explanation. Restatement (Second) of Agency § 94, comment b (1957). There is no adequate explanation on the record. In fact, the obvious explanation for Sea Lion's conduct was concern that disavowal would both jeopardize the deal with Air Log as well as subject its president to individual liability on a large contract.[4]

To summarize: Air Log has shown (1) an agency relationship, (2) actual knowledge of the purportedly unauthorized act by the principal, and (3) no act of subsequent disavowal by Sea Lion communicated to Air Log until litigation arose over a year later. Sea Lion presents no material evidence to the contrary.[5]

## III.  CONCLUSION

There is no genuine issue of material fact as to ratification by silence under the test of the Restatement (Second) of Agency § 94 and *Bruton.* Secret disavowals of liability do not suffice.

AFFIRMED.

## ORDER

On consideration of the petition for rehearing, filed on December 18, 1989,

IT IS ORDERED:

1.  The petition for rehearing is granted.

2.  Opinion No. 3537, filed by the court in the above matter on December 8, 1989, is withdrawn.

3.  The attached Opinion on Rehearing, No. 3558 is filed on this date in its place.

Entered by direction of the court at Anchorage, Alaska on February 9, 1990.

---

4.  There is uncontradicted evidence in the record that a second liability-adjusting memorandum (MOU) was drafted, though the document itself does not appear. As the document would be cumulative evidence of Sea Lion's knowledge of the 1985 FSA, its existence or non-existence is immaterial.

5.  In its reply brief, Sea Lion asks rhetorically, "[H]ow many times must Air Log hear a clear statement regarding Sea Lion's intent not to be bound to BTS obligations?" The answer is "Only once." However, this "once" must come after its agent signs a contract on its behalf and the principal learns of the act and realizes the risk created, especially when advised by counsel on the matter. Furthermore, the third party must hear it.