ASKINUK CORPORATION, Appellant,

v.

LOWER YUKON SCHOOL
DISTRICT, Appellee.

No. S–12786.

Supreme Court of Alaska.

July 31, 2009.

A. Lee Petersen, Petersen Professional Corp., Willow, for Appellant.

Raymond E. Goad, Jr., and Saul R. Friedman, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellee.

Before: MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

After the Lower Yukon School District leased twenty acres from Askinuk Corporation on which to build a school in Scammon Bay, Askinuk sued the school district to reform or invalidate the lease. The lease specified a lease rate of one dollar per year, subject to renegotiation after ten years. It also provided that if the parties could not reach mutual agreement upon renegotiation, the original payment rate would remain in effect until agreement could be reached. Askinuk claimed that it never assented to the lease's payment and renegotiation provisions; that the lease lacked consideration; and that George Smith, who signed the lease for Askinuk and was chair of Askinuk's board, had a conflict of interest that invalidated the lease. The superior court rejected these contentions and entered summary judgment for the school district. Because we conclude that the lease was valid and enforceable, we affirm.

## I. FACTS AND PROCEEDINGS

### A. Factual History

The Lower Yukon School District provides public education in the region that includes the village of Scammon Bay. Askinuk Corporation is the Scammon Bay native village corporation created by the Alaska Native Claims Settlement Act. In October 2003 the school district proposed leasing from Askinuk twenty acres on which to build and operate a new public school in Scammon Bay. The school district's proposed lease had a term of fifty-five years, with options for two ten-year renewals. Section III of the proposed lease addressed the duration of the lease; Section IV addressed the payment rate. The proposed lease called for the school district to pay Askinuk one dollar per year.

Askinuk's attorney reviewed the proposed lease and in October 2003 sent Askinuk's board of directors a letter commenting on the school district's proposal. The letter cautioned the board that approving a payment of one dollar per year could be regarded as breaching the directors' fiduciary duty to the shareholders. The letter added that because "some members of [Askinuk's] Board [were] also members of the school board ... an obvious conflict of interest" existed. George Smith was then the chair of Askinuk's board and the vice-chair of the school district's board. Timothy Kaganak was the school district's treasurer and was also on Askinuk's board. The lawyer's October 2003 letter also stated that the conflict of interest could be avoided if a reasonable rental rate were agreed upon or if the corporation's shareholders approved the lease:

> If the school district were offering to pay a fair rental on this property, adjustable to changes of circumstances every five or ten years, there may not be a conflict of interest. But when the school district is asking for a gift of the use [of] some of the corporation's most valuable land for 75 years, the issue becomes very difficult, especially when the corporation is struggling to pay its bills. One appropriate way to deal with a transaction of this sort would be to call a special meeting of the shareholders and let them vote on it. If the shareholders approve, it is their responsibility, not the responsibility of the Directors.

In response, Askinuk's board asked its attorney to draft a lease addressing his concerns. He revised the proposed lease by changing, among other things, the payment rate. He proposed a rate of $400 dollars per month for the first ten years, after which the rate would be adjusted to conform to changes in the cost of living index.

In November 2003 Askinuk's three board members who had no conflict of interest and one member of Askinuk's land committee met to discuss the proposed terms. The attendees decided that, to encourage the school district to build a school in Scammon Bay, the corporation would charge "only" $400 per month.

School district representatives met with Askinuk's board on March 4, 2004 to discuss Askinuk's proposed changes. George Smith, chair of Askinuk's board and vice-chair of the school district's board, did not attend. Smith stated in an email to Askinuk's lawyer that he "completely stayed away from the meeting not wanting to taint the proceedings with a possible conflict of interest." Of the five Askinuk representatives present, three later submitted affidavits giving nearly identical accounts of what happened at the meeting. Their affidavits stated that there was discussion of the school district's proposed one dollar per year payment rate—subject to renegotiation after ten years—after a representative of the school board stated that the school district could not pay more than that. The affidavits stated that nothing was said during the meeting about what would happen if the parties could not agree on a new rental rate after ten years and that, at the end of the meeting, the language of the lease's payment term was still to be revised.

Karen Goodwin, the school district's business manager, also attended the March negotiation meeting and had a different understanding of what had happened. According to her, both sides left the meeting with a revised draft of the lease that not only provided for a dollar per year rate subject to renegotiation in ten years, but also provided that rent would continue at that rate should no contrary agreement be reached during renegotiation.

On the afternoon of March 4, 2004, Smith emailed Goodwin, stating, "I made short work of the lease agreement with the changes." The email indicated that an electronic file entitled "lease.doc" was attached. Later that same day, Smith sent an email to Askinuk's attorney indicating that he was attaching a copy of the lease with a revised payment term for the attorney's review.

In the final draft of the lease agreement, the sections relating to duration and payment stated in relevant part:

### Section III

*Term*

The lease term shall be for fifty-five (55) years, commencing on the first day of Oc-

tober 2003, and shall terminate on the last day of October 2058, or upon such date as the premises are no longer used for purposes authorized under Section II above. The Lessee is entitled to two (2) ten (10) year renewals of the Lease under the same terms and conditions.

### Section IV

#### *Payment*

In consideration of the mutual promises contained herein, Lessee shall pay to Lessor the sum of $1.00 a year, for the first ten (10) years of the Lease, after which the Lessor and Lessee shall renegotiate SECTION IV PAYMENT.

However, in the event both parties cannot reach mutual agreement on this section the sum of $1.00 per year payment shall be the amount that will remain in effect until such an agreement can be reached.

If during the term of the Lease taxes are assessed on the leased property, the Lessee may use its exempt status to have the taxes abated, but if abatement of taxes on the leased land is not allowed, the rental will be adjusted to provide adequate additional funds to pay the taxes on the land.

Apparently after reviewing this language, Askinuk's lawyer responded to Smith in a March 4 email and cautioned Smith that its effect would be to "giv[e] the property away for 75 years, unless the school district volunteer[ed] to pay rent." Smith said he would pass on the lawyer's insights to "the members that participated." Smith did forward a copy of the lawyer's email to Goodwin, telling her not to "sweat over it unless we can't decide on what font to use on the language." But there is no evidence Smith sent any of the lawyer's cautionary advice to Askinuk's representatives. In a March 5 email to Smith, Askinuk's lawyer described the wording of the payment term as being "inept" and stated that Askinuk had "given away the store without consulting its attorney."

Askinuk's board decided at the regular board meeting on March 12 to submit the lease to Askinuk's shareholders for approval at the annual meeting in April. When the subject of the lease came up for discussion at the annual meeting in April, Timothy Kaganak told the shareholders that if they did not approve an annual rental rate of one dollar, the school district would put the new school somewhere else. Although George Smith presided over the meeting, he did not express any opinion about the proposed lease. The shareholders discussed the benefits and consequences of leasing land to the school district for one dollar per year. Some shareholders stated that they favored the proposed rate because they wanted a school for their children and the high-wage job opportunities the project would bring to the community. Some shareholders expressed a desire to get a better rate to help out the "cash poor" corporation.

During the discussion, Anthony Ulak, a member of Askinuk's land committee, made a motion to lease the land to the school district for one dollar a year, subject to renegotiation after ten years. Thirty-nine shareholders voted in favor of Ulak's motion; ten shareholders voted against. Ulak later stated in an affidavit that the text of the proposed lease was not read to the shareholders before the vote and that he did not see a copy of the lease during the meeting. He also stated in his affidavit that "[n]othing was said about what would happen if the parties could not agree on the rent after 10 years and that was not included in [his] motion."

After the meeting Smith notified the school district that Askinuk's shareholders had approved the lease. Askinuk's lawyer had previously advised Smith that, so long as he did not participate in the approval process, his school board membership did not preclude him from signing the lease, as signing was solely a "ministerial act." In late April 2004 Smith signed the lease for Askinuk; Superintendent Robert Robertson signed the lease for the school district.

### B. Procedural History

In August 2005 Askinuk filed a superior court complaint seeking to invalidate or reform the lease. The school district moved for partial summary judgment. Askinuk cross-moved for partial summary judgment, arguing that "the court should find that the

lease signed on April 27, 2004 should be reformed to become a legal and valid contract."

In an amended complaint Askinuk asserted that: (1) internal corporate mistakes make the lease invalid; (2) the school district exerted undue influence on Askinuk's shareholders; (3) the lease results in an unconstitutional taking; and (4) the lease violates equal protection principles. The amended complaint did not alter Askinuk's request for relief. The superior court denied summary judgment to Askinuk "on each cause of action" of the amended complaint, granted summary judgment to the school district on each cause of action, ordered the case dismissed, and entered final judgment for the school district.

In May 2007 Askinuk asked the superior court to alter or amend the judgment. The superior court denied this motion.

Askinuk appeals.

## III. DISCUSSION

### A. Standard of Review

▇▇▇ Askinuk argues that the superior court erroneously granted summary judgment to the school district. Askinuk advances multiple theories for reversal. Its most persuasive arguments concern contract formation and contract voidability. We review grants of summary judgment de novo on questions of contract formation.[1] We will affirm a grant of summary judgment if the evidence in the record presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[2] On

questions of law, we exercise our independent judgment.[3] We adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[4]

### B. The Superior Court Correctly Held that a Valid Lease Was Formed.

Askinuk argues that a valid lease was never formed because: (1) George Smith lacked authority to bind the corporation, (2) neither the corporation's board nor its shareholders assented to the lease, and (3) the lease was unsupported by sufficient bargained-for consideration.

#### 1. Authority to act

Askinuk argues that the lease is void because Smith acted without authority to bind the corporation. We focus here on whether Smith had apparent authority to sign the lease for Askinuk.[5]

▇▇▇ Apparent authority to do an act is created as to a third person when a principal's conduct, reasonably interpreted, "causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."[6] Three considerations are pertinent in evaluating apparent authority: (1) the manifestations of the principal to the third party; (2) the third party's reliance on the principal's manifestations; and (3) the reasonableness of the third party's interpretation of the principal's manifestations and the reasonableness of the third party's reliance.[7]

---

1. *Copper River Sch. Dist. v. Traw*, 9 P.3d 280, 283 (Alaska 2000) (citing *Davis v. Dykman*, 938 P.2d 1002, 1006 (Alaska 1997)).

2. *Id.* at 283.

3. *Id.* (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

4. *Id.*

5. Given the outcome of the apparent authority issue, we do not need to decide whether Smith had actual authority to sign the lease with the disputed default payment term. An agent acts with actual authority if, "at the time of taking action that has legal consequences for the princi-

pal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." RESTATEMENT (THIRD) OF AGENCY § 2.01 (2006). There is insufficient evidence in the record to conclude at the summary judgment stage that Smith reasonably believed the shareholders had authorized the lease in its final form prior to his signing.

6. *Anderson v. PPCT Mgmt. Sys., Inc.*, 145 P.3d 503, 509 (Alaska 2006) (quoting *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 (Alaska 1983)).

7. *Id.* at 509 (citing *Cummins, Inc. v. Nelson*, 115 P.3d 536, 542 (Alaska 2005)).

■ There is no real dispute here about the first two elements. The closer question is whether it was reasonable for the school district to rely on Smith's apparent authority to sign the lease. In the official commentary to AS 10.06.020–.025 of the Alaska Corporations Code, legislative counsel recognized that a third party's belief in the real authority of a corporate agent must "go beyond the 'white heart and empty head' standard of subjective 'good faith'." [8] Nonetheless, we have held that a third party need not investigate the extent of an agent's authority or "deal only at its peril." [9] It is undisputed here that Smith informed the school district that Askinuk's shareholders had approved the lease. There is also no evidence that any Askinuk representative said anything to the school district before Smith and Superintendent Robertson signed the lease that would have led the school district to think either that the shareholders had not approved the proposed lease or that they were uninformed of the material provisions of the lease when they voted. It is also undisputed that Askinuk held Smith out as the chair of its board of directors. There is consequently no genuine material factual dispute as to this issue— it was reasonable for the school district to believe that Askinuk had authorized Smith to sign the lease on its behalf. We accordingly conclude that Smith had apparent authority to sign the lease and bind Askinuk.

### 2. Mutual assent

Askinuk argues that the lease is nonetheless void because Askinuk never assented to all of its terms, most particularly the provision in Section IV stating that the annual payment rate would remain one dollar if the parties could not agree on a different amount after renegotiation. Askinuk argues that because neither its board of directors nor its shareholders ever approved this provision in Section IV, the corporation never assented to its terms. Although the shareholders approved a rental rate of one dollar per year, subject to renegotiation after ten years, Askinuk argues that the lease was not made available to the shareholders and that the "motion voted on made no mention of Section IV or its terms." Askinuk implicitly argues that the shareholders did not know and could not have known that the rental rate would remain at one dollar per year if a different rate could not be agreed upon after renegotiation.

Askinuk contends that the formation of a contract requires both an offer that includes all "essential terms" and an unequivocal acceptance of the same terms by the offeree. Askinuk assumes that the provision that the rental rate would remain the same absent contrary agreement was an "essential term."

■ It is unnecessary to consider here whether this provision was an essential term. Because we conclude that the superior court was correct in holding that AS 10.06.020 prevents Askinuk from prevailing on this argument, it is irrelevant whether the shareholders, when they voted at the annual meeting, were ignorant of specific lease terms even if those terms were "essential." Alaska Statute 10.06.020 prevents a corporation from avoiding its contractual liability in certain circumstances, stating that

> [a] limitation upon the powers of the shareholders, officers, or directors, or the manner or exercise of their powers, contained in or implied by the articles of incorporation, bylaws, or action of the board, or by AS 10.06.605–10.06.678 or 10.06.705–10.06.788 or by a shareholders' agreement may not be asserted as between the corporation or a shareholder and a third person. . . .

The official commentary to section .020 states that it was intended to apply in situations in

---

8. Commentary on the Alaska Corporations Code, Senate–House Joint Journal Supp. No. 9 at 17, 1987 House–Senate Joint Journal. Legislative counsel was likely referring to the "*pure* heart and empty head" standard of good faith applied by courts in other contexts. *See Alaska Fed. Sav. & Loan Ass'n of Juneau v. Bernhardt*, 794 P.2d 579, 583 (Alaska 1990) (quoting Schwarzer, *Sanctions Under the New Federal Rule 11–A Closer Look*, 104 F.R.D. 181, 187 (1985) ("There is no [longer] room for a pure heart, empty head defense under Rule 11.")).

9. *Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 117 n. 3 (Alaska 1990) (holding corporation liable on contract despite agent's lack of authority to bind the corporation because board of directors ratified contract).

which actual authority is lacking.[10] The commentary explains that if apparent authority to enter a contract is present, "the third party acquires the full liability of the betrayed corporate principal upon the executory terms of the unauthorized agreement."[11] We concluded above that George Smith had apparent authority to enter into the contract on behalf of Askinuk.[12] Alaska Statute 10.06.020 therefore precludes Askinuk from avoiding its contract on the basis that the directors arguably failed to observe internal requirements for corporate action by neglecting to inform the shareholders of the disputed provision before they voted.[13]

Askinuk argues that AS 10.06.020 does not bar its mutual assent argument because the lease was not signed by two Askinuk corporate officers, as Askinuk contends AS 10.06.483(d) requires.[14] Alaska Statute 10.06.483(d) restricts a corporation's ability to contest the validity of a contract signed by two specified officers:

> Subject to the provisions of AS 10.06.020, a note, mortgage, evidence of indebtedness, contract, conveyance, or other instrument in writing, and an assignment or endorsement of these, executed or entered into between the corporation and another person, *if signed by two individuals,* one of whom is the chairman of the board, the president, or a vice-president and the other of whom is the secretary, an assistant secretary, the treasurer, or an assistant treasurer of the corporation, is not invalidated as to the corporation by a lack of authority of the signing officers in the absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the instrument.[15]

The school district argues that Askinuk failed to preserve its argument as to the application of subsection .483(d). As a general rule, we will not consider arguments first raised on appeal.[16] Because Askinuk did not raise its subsection .483(d) argument in the superior court, it has not been preserved.

In any event, we are unpersuaded by Askinuk's contention. It is not likely the legislature intended subsection .483(d) to limit the application of section .020. Instead, the legislative history shows that subsection .483(d) was intended to "eliminate the possibility of the corporation successfully contesting liability,"[17] by providing a "strategy by which a third party can *preclude* a corporate principal's denial of the authority of an officer as agent."[18] Subsection .483(d) does not impose a two-signature requirement for all corporate contracts; rather it ensures greater security for third parties who contract with corporations when the two-signature standard has been met. When the two-signature standard has been satisfied, subsection .483(d) prevents a corporation from avoiding contractual liability unless the third party had actual knowledge that authority to

---

10. Commentary on the Alaska Corporations Code, Senate–House Joint Journal Supp. No. 9 at 16, 1987 House–Senate Joint Journal.

11. *Id.*

12. *See* Part III.B.1.

13. Askinuk also argues that Smith failed to abide by a provision in the corporation's bylaws that required contracts to be signed by two officers. This argument is also foreclosed by AS 10.06.020.

14. Askinuk makes a similar argument with respect to AS 10.06.015. That section governs situations in which a claim of *ultra vires* may "affect the rights of third parties who have dealt with a corporate entity." Commentary on the Alaska Corporations Code, Senate–House Joint Journal Supp. No. 9 at 14, 1987 House–Senate Joint Journal. A transaction is *ultra vires* when it is "beyond the powers of the corporation as those powers are conferred by law and the terms of the articles of incorporation." *Id.* Because there was no showing that Askinuk was prohibited by law or its articles from leasing its land, or from doing so on the disputed terms, the transaction at issue here was not *ultra vires.* AS 10.06.015 is accordingly irrelevant.

15. AS 10.06.483(d) (emphasis added).

16. *Hoffman Constr. Co. of Alaska v. U.S. Fabrication & Erection, Inc.,* 32 P.3d 346, 355 (Alaska 2001) (citing *Frost v. Ayojiak,* 957 P.2d 1353, 1355–56 (Alaska 1998)).

17. Commentary on the Alaska Corporations Code, Senate–House Joint Journal Supp. No. 9 at 19, 1987 House–Senate Joint Journal.

18. *Id.* at 113 (emphasis added).

bind the corporation was lacking.[19]

The superior court therefore did not err in granting summary judgment to the school district on the issue of mutual assent.

### 3. Consideration

Askinuk also argues that the lease lacks bargained-for consideration because "[t]here is no evidence that Askinuk ever bargained for the 'peppercorn' o[f] 'legal detriment' of $1.00 per year; they bargained for just compensation." It similarly argues that the school district's promise to renegotiate the lease is illusory and cannot be consideration because the lease's renegotiation provision does not provide a definite and specific rental rate and because the renegotiation provision is not "easily enforceable."

The superior court determined that the renegotiation provision is not illusory and that the lease is supported by adequate consideration.[20]

■■■ We have held that "[t]o constitute consideration, a performance or a return promise must be bargained for. . . . A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise."[21] Here Askinuk promised to lease land to the school district and the school district promised to pay one dollar per year to lease the land solely for "public school purposes"; the lease implicitly contemplated construction and operation of a new school in the village. This exchange provided sufficient bargained-for consideration, apart from the payment rate.

■■■ Moreover, Askinuk's argument that the renegotiation provision is "illusory and cannot constitute consideration" is unpersuasive. Illusory promises are those that "by their terms make performance entirely optional with the 'promisor'."[22] The renegotiation provision requires the parties to renegotiate the payment term in ten years and provides that "in the event both parties cannot reach mutual agreement on [the payment term] the sum of $1.00 per year payment shall . . . remain in effect until such an agreement can be reached." Because the covenant of good faith and fair dealing is implied in all contracts in Alaska,[23] this provision is not illusory. The covenant prevents each party from doing anything that will

---

**19.** AS 10.06.483(d).

**20.** The superior court addressed Askinuk's illusory promise argument as follows:

> Askinuk claims that the renegotiation clause of the lease renders the contract illusory. The phrase illusory promise means "words in a promissory form that promise nothing." An illusory promise is not a promise at all and cannot act as consideration; therefore no contract is formed. *Cordry v. Vanderbilt Mortgage & Finance, Inc.*, 445 F.3d 1106, 1110 (8th Cir.2006), *quoting* Corbin on Contracts § 5.28 (rev. ed.1995). A good example of an illusory promise is a contract that says I will pay five dollars for the bike unless I choose not to. Alaska courts have found that satisfaction clauses, which appear to give one side of a contract the incentive to act in bad faith, are not illusory because the courts "read them to require the exercise of honest judgment and good faith." *Kennedy Associates, Inc. v. Fischer*, 667 P.2d 174, 180 (Alaska 1983).
>
> Askinuk argues that Section IV of the lease creates an illusory promise with this clause: "However, in the event both parties cannot reach mutual agreement on this section the sum of $1.00 per year payment shall be the amount that will remain in effect until such an agreement can be reached." This clause does

not make the promise to renegotiate illusory even though it does put the District in a much stronger negotiating position. Like in *Kennedy Associates*, a promise to renegotiate assumes that the renegotiation will happen in good faith even though the District is given much more power in the negotiation through the Section IV clause. The District still must renegotiate after 10 years and, by the covenant of good faith and fair dealing, it must enter those negotiations in good faith. Section IV of the lease provides a promise the District will renegotiate and it is required by law to renegotiate in good faith. As a matter of law, this is not an empty promise. There is no issue of material fact as to illusory promise. The court grants the District summary judgment on the illusory promise claim. This implicitly denies Askinuk's summary judgment claim.

**21.** *Reust v. Alaska Petroleum Contractors, Inc.*, 127 P.3d 807, 811 n. 4 (Alaska 2005) (quoting Restatement (Second) of Contracts § 71 (1981)).

**22.** Restatement (Second) of Contracts § 77 cmt. a (1981).

**23.** *Casey v. Semco Energy Inc.*, 92 P.3d 379, 384 (Alaska 2004) (citing *Ellingstad v. State, Dep't of Natural Res.*, 979 P.2d 1000, 1009 (Alaska 1999)).

injure the right of the other to receive the benefits of the agreement.[24] Askinuk can therefore rely on the school district's express promise to renegotiate the rate and its implied promise to renegotiate in good faith. The superior court did not err in granting summary judgment to the school district on this issue.

## C. The Superior Court Correctly Held that the Lease Was Enforceable.

Askinuk alternatively argues that the lease is unconscionable and is therefore not enforceable. It also argues that the lease does not accurately reflect the parties' true mutual intention.

### 1. Unconscionability

Quoting the Restatement (Second) of Contracts, section 208, comment b,[25] Askinuk first argues that the lease is unconscionable because it reflects a bargain that "no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." Askinuk contends that there was a "vast disparity of bargaining power" between Askinuk and the school district in terms of their available resources and the experience and educational background of their representatives. The fact that it was represented by counsel is immaterial, Askinuk argues, because its attorney was not present at the critical meetings at which the lease was discussed, notably the annual shareholder's meeting. Askinuk implicitly argues that its shareholders were coerced to approve the one-dollar-per-year rental rate because of Kaganak's "threats" that there would be no new school otherwise.

We have relied on the Restatement approach in the past when applying the doctrine of unconscionability.[26] The Restatement does not provide a concise definition of what makes a contract or term unconscionable and instead states that "[t]he determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect."[27] Although inadequacy of consideration "does not of itself invalidate a bargain," the Restatement provides that a "gross disparity in the values exchanged may be an important factor in a determination that a contract is unconscionable."[28] A contract or a contractual term is "not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party."[29] But we have also held that unconscionability may exist if the circumstances indicate a "vast disparity of bargaining power coupled with terms unreasonably favorable to the stronger party."[30]

The superior court held that the lease in this case was not unconscionable. It concluded that, because Askinuk was represented by counsel and was experienced in the art of negotiation, no disparity of bargaining power was present. The court explicitly noted that the school district had leased land for public school purposes from four other entities on terms that were similar to those in Askinuk's lease.[31] Each of those other four leases had a term of fifty-five years (with the additional option of two ten-year renewals) and a rental rate of one dollar per year. None of the leases contained a provision that the rental rate was subject to renegotiation after ten years. The superior court concluded that the fact that Askinuk was able to

---

**24.** *Ellingstad,* 979 P.2d at 1009 (citing *Guin v. Ha,* 591 P.2d 1281, 1291 (Alaska 1979)).

**25.** RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. b (1981).

**26.** *Helstrom v. North Slope Borough,* 797 P.2d 1192, 1199 (Alaska 1990) (citing *Vockner v. Erickson,* 712 P.2d 379, 381–83 (Alaska 1986)).

**27.** RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. a (1981).

**28.** *Id.* at cmt. c.

**29.** *Vockner,* 712 P.2d at 382 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. d (1981)).

**30.** *OK Lumber Co. v. Alaska R.R. Corp.,* 123 P.3d 1076, 1081 n. 17 (Alaska 2005) (quoting *Municipality of Anchorage v. Locker,* 723 P.2d 1261, 1265–66 (Alaska 1986)).

**31.** The four entities were Pilot Station, Inc., Sea Lion Corporation, the City of Kotlik, and Swan Lake Corporation.

negotiate a renegotiation provision demonstrated that there was no disparity of bargaining power between it and the school district.

▇▇ Askinuk has not demonstrated that the superior court's conclusion was erroneous. We are unconvinced that there was a "disparity of bargaining power" even though Askinuk's attorney was not present when the lease was discussed and eventually approved by the shareholders. Askinuk and its shareholders had access to legal advice throughout the negotiation process and could have availed themselves of their attorney's advice at any time.[32] We are also unpersuaded by Askinuk's contention that the shareholder vote was coerced or that the lease is so one-sided on its face as to render it unconscionable. The shareholders had a meaningful choice whether or not to enter into the lease and could have refused. While the payment rate is no doubt minimal, the evidence suggests that the shareholders' ultimate decision was not motivated by how much the district was to pay annually. Before voting to approve an annual rental rate of one dollar, some of the shareholders discussed how they wanted not only a new school for their children but the high-wage job opportunities the lease would bring into the community. We

accordingly cannot conclude that the lease—or any one term within it—is unconscionable in light of its setting, purpose, and effect.

▇▇ Askinuk also argues that the lease is unconscionable because George Smith sat on the boards of both the school district and Askinuk and allegedly drafted the offending "in the event that both parties cannot reach mutual agreement" language in the amended Section IV.

▇▇ Transactions between entities with interlocking directorates may be voidable in certain situations if the common directors participate in the decision to enter into the transaction.[33] But the mere fact that the directorates of two contracting entities overlap does not make any transaction between them voidable if the shareholders, not the board of directors, voted to approve the transaction. Even assuming Smith drafted the language to which Askinuk now objects, the lease in its final form was available to the shareholders before they voted to approve it. Askinuk has not alleged that Smith or anyone else would not have provided the actual lease had the shareholders wanted to see it.

We accordingly hold that the superior court did not err in concluding that the lease was not unconscionable.

**32.** The dissent similarly argues that "no comfort can be taken from the fact that Askinuk was represented by counsel" because the cautionary legal advice the attorney gave was communicated only to Smith and not to the shareholders or other board members. (Op. at 271) But three of the disinterested board members and one member of the land committee were aware of Askinuk's attorney's negative opinions regarding the original proposed lease agreement. The minutes from a joint meeting of Askinuk's board of directors and its land committee indicate that the participants had read the letter Askinuk's attorney sent the board in October 2003. The letter explained that the lease as it was then written contemplated that Askinuk would "give away" some of its "principal asset" for what was effectively seventy-five years. That the board may not have been apprised of later correspondence which largely reiterated these observations is of little significance, in our view.

**33.** AS 10.06.478(c) governs the voidability of interlocking-directorate transactions approved by an entity's board of directors. According to subsection .478(c), such transactions will not be void or voidable solely because a common director was present when the board authorized the

transaction if: (1) the board votes in good faith to authorize the transaction after having been informed of all material facts, or (2) the shareholders approve the transaction in good faith. AS 10.06.478(c) provides:

A contract or other transaction between a corporation and a corporation or association of which one or more directors of the corporation are directors is neither void nor voidable because the director or directors are present at the meeting of the board that authorizes, approves, or ratifies the contract or transaction, if the material facts of the transaction and the director's other directorship are fully disclosed or known to the board and the board authorizes, approves, or ratifies the contract or transaction in good faith by a sufficient vote without counting the vote of the common director or directors or the contract or transaction is approved by the shareholders in good faith.

AS 10.06.478(c) implies that transactions between entities with interlocking directorates may be void or voidable if they were approved by board action, a common director was present when the board approved the transaction, and neither of the two safeguarding conditions were met.

## 2. Mistake

Askinuk argues that the lease does not accurately reflect the true mutual intention of the parties, and that reformation is consequently appropriate. The superior court held that reformation was not an appropriate remedy.

The equitable remedy of reformation is available only in certain well-defined circumstances.[34] These circumstances include situations involving mistake of fact, fraud, or mutual mistake, or situations in which "a party executes a written instrument knowing the intention of the other party as to the terms to be embodied therein, and knowing that the writing does not accurately express that intention."[35] A party seeking reformation must prove the elements of reformation by clear and convincing evidence.[36] Askinuk seems to base its reformation argument on a theory of unilateral mistake.

The Restatement (Second) of Contracts provides that a mistake of one party may in certain situations make a contract voidable, but only if that party did not bear the risk of the mistake.[37] According to section 154 of the Restatement (Second) of Contracts, a party bears the risk of a mistake if "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as

sufficient."[38] This is sometimes referred to as "conscious ignorance."[39] Askinuk's shareholders bore the risk of mistake when they voted to authorize the lease without asking that the lease be made available to them for closer review.

Askinuk contends that it reasonably expected that it would receive "just compensation for its land" and that the lease in its final form does not accurately express that intention. Askinuk seems also to contend that the school district executed the lease knowing that it did not accurately reflect Askinuk's intent. It argues the school district "knew all along that it should pay just compensation" as evidenced by the fact that the school district had sometime before October 2003 budgeted $120,000 for "land." Askinuk accordingly requests that we reform Section IV "to make the amount of consideration specific and definite, legal and just." We decline Askinuk's request. We conclude that Askinuk has not demonstrated there was a genuine question of material fact about whether the school district knew that the Askinuk shareholders had authorized the lease under a mistaken apprehension.

Nor is this a case in which it would be unconscionable to enforce any mistake on Askinuk's part. Askinuk's shareholders knowingly agreed to accept the one-dollar-per-year rate after discussing the advantages and disadvantages of doing so. We have already concluded that this rate and the hold-

---

**34.** *Ahwinona v. State*, 922 P.2d 884, 887 n. 3 (Alaska 1996) (stating contract reformation "is the proper remedy where it is alleged that the instrument does not conform to the actual intentions of the parties" (quoting *D.M. v. D.A.*, 885 P.2d 94, 96 (Alaska 1994))).

**35.** *Id.* at 887 n. 3 (quoting *Lathrop Co. v. Lampert*, 583 P.2d 789, 790 (Alaska 1978)); *see* RESTATEMENT (SECOND) OF CONTRACTS § 155 cmt. a (1981) ("[R]eformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing."); *see also Fireman's Fund Mortgage Corp. v. Allstate Ins. Co.*, 838 P.2d 790, 797 (Alaska 1992) ("Traditionally, reformation is a tool courts use to correct what are essentially errors in the drafting of a contract so as to conform the written agreement to the 'clear intention of the parties.'" (citing *Oaksmith v. Brusich*, 774 P.2d 191, 197 (Alaska 1989))).

**36.** *Adams v. Adams*, 89 P.3d 743, 752 (Alaska 2004) (citing *Voss v. Brooks*, 907 P.2d 465, 468 (Alaska 1995)).

**37.** RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981) provides that:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

**38.** *Id.* § 154.

**39.** *Wasser & Winters Co. v. Ritchie Bros. Auctioneers (Am.), Inc.*, 185 P.3d 73, 79 (Alaska 2008).

over-rate provision in Section IV were not unjust in light of the anticipated benefits—a new school and high-wage job opportunities for the community—Askinuk would gain from the lease and in light of the school district's duty to renegotiate the rate in good faith. We conclude that the superior court did not err in denying Askinuk's reformation request.

## IV. CONCLUSION

We therefore AFFIRM the superior court judgment.

MATTHEWS, Justice, dissenting.

FABE, Chief Justice, not participating.

MATTHEWS, Justice, dissenting.

In reviewing a judgment that is based on the grant of a motion for summary judgment, the appellate court is required to take that view of the facts, including reasonable inferences drawn from the facts, that is most favorable to the losing party.[1] In discussing the facts related below I adopt this perspective.

Askinuk Corporation was willing to lease the twenty-acre parcel to the school district for a dollar a year for the first ten years of the lease term in order to ensure that the new school was built. But after the initial ten-year term Askinuk wanted fair compensation for the use of its land. Askinuk's shareholders thought that providing for renegotiation of the rent after ten years would ensure fair compensation. But the shareholders were not alerted to the fall-back clause in the revised lease that provided that if the parties could not agree on the amount of the rent when the time for renegotiation came, the rent would still be one dollar per year.

The fall-back clause is of great importance. Without it, one could assume that if the parties could not agree on an amount for the new rent a court would set the rent for them based on a standard that would recognize Askinuk's desire for fair compensation after the initial ten-year period.[2] But with the fall-back clause in place the renegotiation clause means very little. The district will always be able to claim in good faith that it is strapped for funds and that it must therefore decline to pay more than nominal rent. This predictable posture will satisfy the district's obligation of good faith and fair dealing. The upshot will be that Askinuk will have made a gift of land for seventy-five years when in actuality it only intended a ten-year gift.

I believe that the lease with the fall-back clause falls readily within the definition of unconscionability quoted in today's opinion.[3] No lessor desiring fair compensation after an initial ten-year term would sensibly agree to the fall-back clause and no lessee knowing what the lessor thought it was achieving by the clause could fairly and honestly accept it. Further, no comfort can be taken from the fact that Askinuk was represented by counsel. It is true that Petersen, the attorney for Askinuk, correctly advised Smith that the fall-back clause "has the effect of giving the property away for 75 years, unless the school district volunteers to pay rent." But though Smith, who was both the chairman of the board of Askinuk and the vice-chairman of the school district's board, dismissively[4] forwarded this opinion to the school district, there is no evidence that he communicated it to Askinuk's other board members or to Askinuk's shareholders. Thus, the fact that Askinuk was represented by counsel, in fact by counsel who gave excellent advice, does nothing to cure the unconscionability in this case

1. *Beegan v. State, Dep't of Transp. & Pub. Facilities,* 195 P.3d 134, 138 (Alaska 2008) (explaining that when reviewing a grant of summary judgment, "[a]ll reasonable inferences are drawn in favor of the nonmovant").

2. *Cf. City of Kenai v. Ferguson,* 732 P.2d 184, 186–88 (Alaska 1987) (lease which called for rent to be renegotiated every five years was enforceable as court could declare the missing rental term in order to effect the reasonable expectation of the parties).

3. Op. at 268.

4. When Smith emailed Goodwin, the school district's business manager, a copy of Petersen's seventy-five-year give-away memo, Smith stated: "I wouldn't sweat over it unless we can't decide on what font to use on the language." It is also noteworthy that Petersen was not in Scammon Bay during the formation of the lease. Rather his office is in Willow, some 500 miles away, and there is no indication that he communicated with any representative of Askinuk other than Smith during the time in question.

because counsel's opinion concerning the illusory nature of the renegotiation clause was communicated only to Smith, and through Smith to the school district, but not to the disinterested representatives of Askinuk.

Smith's failure to communicate Petersen's opinion to the board is of critical importance. Petersen had advised the Askinuk board in October of 2003 that the proposed lease was a seventy-five-year give-away. The board took this advice seriously and sought a lease under which the rental rate would be $400 per month for the first five years. At the end of the first five years, the rent would be adjusted for cost-of-living changes, and this process would be repeated at each five-year anniversary. At the March 4, 2004 meeting, the school district representatives told the board that it could not afford more than one dollar per year. At that point, in order to resolve their impasse, the parties discussed the possibility of renegotiating the rent after ten years. They tentatively agreed to this approach. The board members appear to have thought that even though they had not completely eliminated the give-away character of the lease, they had reduced its duration from an unacceptable seventy-five years to an acceptable ten years. Petersen's opinion that the fall-back clause made the renegotiation clause illusory would have disabused them of this belief, but Smith withheld this information from them.

I also do not agree that the transaction is insulated from the need for judicial scrutiny on unconscionability grounds by the fact that the shareholders at the annual meeting of April 20, 2004, agreed to a motion "to lease the proposed land site ... for [$]1.00 a year but negotiable after 10 years." A shareholder resolution may remove the taint that would otherwise attach to a transaction where directors have a conflict of interest, but the general rule is that such a cure can occur only when the shareholders are fully informed.[5] The Model Business Corporation Act requires a conflicted director to disclose those facts known to him "that a director free of such conflicting interest would reasonably believe to be material in deciding whether to proceed with the transaction."[6] Applying this same standard to disclosures to ratifying shareholders, the standard would not be satisfied in this case. There is no evidence that the shareholders were advised either of the existence of the fall-back clause or of their attorney's opinion that it meant that the renegotiation right would be meaningless.

In conclusion, I believe that the lease is unconscionable under the facts of this case when they are considered in the light most favorable to Askinuk. The unconscionability can in no sense be said to have been purged by the approval of the lease by Askinuk's board or by its shareholders. Neither the board nor the shareholders knew of the fall-back clause or that it made the renegotiation clause illusory because the dual director, Smith, kept that knowledge from them. I would therefore reverse the judgment of the superior court and remand this case for trial.

5. Edward Brodsky & M. Patricia Adamski, Law of Corporate Officers and Directors: Rights, Duties, and Liabilities § 3.7, at 3–14 (2003) ("For shareholder approval to have any effect, it must be given after full disclosure ...."); id. at 3–16 ("[The] entire atmosphere is freshened and a new set of rules invoked where formal approval has been given by a majority of independent, fully informed stockholders." (quoting Gottlieb v. Heyden Chemical Corp., 91 A.2d 57, 59 (Del.1952)) (internal quotation marks omitted)).

6. Model Business Corp. Act Ann. § 8.60(7) (4th ed.2008); see id. at § 8.61(b), § 8.63(a).